UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

DEC 08 2022 LM

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. |
| | ) | |
| v. | ) | <u>Violations</u>: Title 18, United States |
| | ) | Code, Sections 1343 (Wire Fraud) and |
| MARK ALAN SCHWARTZ | ) | 1028A(a)(1) (Aggravated Identity Theft) |

**COUNT ONE**
**(Wire Fraud)**

1:22-cr-00635
Judge John F. Kness
Magistrate Judge Young B. Kim

The SPECIAL JULY 2021 GRAND JURY charges:

1.      At times relevant to this indictment:

**BACKGROUND**

        a.      Defendant MARK ALAN SCHWARTZ operated a private law practice and a real estate tax lien business. SCHWARTZ was licensed to practice law in the State of Illinois and elsewhere.

        b.      Victim 1, a resident of Chicago, Illinois, was a medical doctor specializing in plastic surgery. Victim 1 served as the chief of plastic surgery at a university hospital in Chicago.

        c.      During the course of his medical practice, Victim 1 invented a new type of surgical suture, incorporating a thin layer of mesh, to strengthen the repair of soft tissue and promote healing.

        d.      Victim 1's mesh-suture product was patented in the United States and other countries around the world.

        e.      Victim 1's university employer owned and retained certain intellectual property ("IP") rights to his invention.

### Formation of the Business

f.      In or about 2012, Victim 1 partnered with SCHWARTZ, a former patient and friend, to form a company to develop, market, and sell Victim 1's surgical product.  They agreed to incorporate the company ("Company 1") in the State of Delaware and to designate Victim 1 as the sole incorporator, sole shareholder, and chairman of the company's board of directors.

g.      Victim 1 and SCHWARTZ further agreed that Victim 1 would serve as the company's Chief Technology Officer and that SCHWARTZ would serve as its Chief Executive Officer and Secretary.  Victim 1, as the company's sole shareholder and board chairman, retained the right to terminate SCHWARTZ at any time for any reason.

h.      Company 1 entered into a "License Agreement" with Victim 1's university employer to allow Company 1 to develop, manufacture, and eventually sell the end-product, in exchange for the payment of certain fees and royalties to the university.

### Incorporation in Puerto Rico

i.      In or about 2015, Victim 1 and SCHWARTZ decided to split Company 1 into two separate companies and to incorporate the two new companies in Puerto Rico.

j.      The purpose of the new Company 1 ("Company 1-PR") was to license and manage the IP rights to Victim 1's invention, while the purpose of the new Company 2 ("Company 2-PR") was to market, produce, and sell the product upon

2

obtaining the necessary regulatory approvals from the FDA and international regulators.

        k.     SCHWARTZ drafted the foundational documents for the two new companies, including corporate bylaws and an "Amended and Restated Founders' Agreement," outlining the terms of the companies' ownership, governance, and organizational structure. As set forth in those founding documents:

- the companies would be governed by a board of directors composed of no more than nine members, with two seats to be filled initially by Victim 1 and SCHWARTZ, and the remaining seats reserved for future appointment;

- Victim 1 would continue to serve as Chairman of the Board and as the companies' Chief Medical and Technology Officer; and

- SCHWARTZ would continue to serve as Chief Executive Officer, responsible for managing the companies' day-to-day business and financial affairs.

        l.     One of the material terms of the agreement between Victim 1 and SCHWARTZ was that Victim 1—as the original inventor and founder—would maintain final decision-making authority and control over the companies. That understanding between Victim 1 and SCHWARTZ was reflected in, among other things:

- SCHWARTZ's employment contract, which provided Victim 1 with the authority to terminate SCHWARTZ, with or without cause; and

- the Amended and Restated Founders' Agreement, which authorized the issuance of one share of common stock in each of the new companies—that is, one share of common stock in Company 1-PR and one share of common stock in Company 2-PR—to Victim 1, and to no one else.

m.     The rights of Victim 1 and SCHWARTZ, as the initial investors in Company 2-PR, also were outlined in an "Investors' Rights Agreement" drafted by SCHWARTZ. The Investors' Rights Agreement provided for, among other things:

- inspection rights, that is, the right of an investor to visit and inspect the company's properties, to examine the company's books and records, and to discuss the company's affairs, finances, and accounts with company officers;

- participation rights, that is, the right to written notice of the issuance of new securities and the right of first refusal to purchase a pro rata share of new securities; and

- voting rights, including the right to vote for an investor representative on the board of directors.

n.     Company 1-PR and Company 2-PR entered into an "Exclusive License Agreement," signed by Victim 1 on behalf of Company 1-PR (the named "Licensor") and by SCHWARTZ on behalf of Company 2-PR (the named "Licensee"), for purposes of allowing Company 2-PR to license from Company 1-PR the IP rights to Victim 1's invention and to develop and commercialize the product. In exchange for this license, Company 2-PR agreed to pay certain fees and royalties to Company 1-PR and to reimburse Company 1-PR for certain costs that may be incurred in prosecuting and maintaining their respective IP rights.

### Funding from Outside Investors

o.     Victim 1 and SCHWARTZ sought outside investors to help fund the increasing costs of business operations.

p.     Through two rounds of investment financing conducted in 2018 and 2019, Victim 1 and SCHWARTZ raised more than $10,000,000 from dozens of

4

family members, friends, colleagues, and other outside investors, including residents
of the Northern District of Illinois. Investors purchased shares of stock in Company
2-PR (referred to as "Series A-1" and "Series A-2" shares) offered to them at prices
ranging from about $18,000 per share (Series A-1, the first round of financing in 2018)
to $36,000 per share (Series A-2, the second round of financing in 2019).

q.     SCHWARTZ caused those investor funds to be deposited into a
company bank account that he had opened at a Wells Fargo branch in Edwards,
Colorado.

r.     With funds raised from Series A investors, SCHWARTZ acquired,
on behalf of the company, an approximate 11,900-square foot, two-story building and
lot to serve as the company's headquarters in Dorado, Puerto Rico.

s.     SCHWARTZ hired members of his family to serve as corporate
officers, including:

- his wife, as Accounting Manager/Managing Director, Asia;
- his daughter, as Digital Marketing Manager;
- his son, as Chief Technology Officer; and
- his son's girlfriend, as Chief Information Officer.

t.     SCHWARTZ also hired Victim 1's wife and son to serve as Chief
Operating Officer and Chief Marketing Officer, respectively.

**SCHWARTZ's Termination and Ensuing Litigation**

u.     Certain disputes arose between SCHWARTZ and Victim 1, which
resulted in SCHWARTZ's termination in 2019. Victim 1 provided SCHWARTZ with
written notice of his decision to terminate SCHWARTZ's employment on August 31,
2019.

5

v.     SCHWARTZ refused to accept his termination and relinquish control of the company's assets, records, and bank accounts to which he had access, which led to litigation in multiple jurisdictions, including:

- an "interpleader" case filed by Wells Fargo in the United States District Court for the District of Colorado to resolve the dispute between Victim 1 and SCHWARTZ over control of the funds in the company's main bank account at Wells Fargo; and

- a lawsuit filed by Victim 1, his wife, and his son against SCHWARTZ, certain members of SCHWARTZ's family, and SCHWARTZ's real estate businesses in the United States District Court for the Northern District of Illinois to resolve their dispute over SCHWARTZ's termination and control of the company.

w.     At the request of Victim 1 and his wife, the Colorado district court appointed a receiver to manage and operate the company's bank account at Wells Fargo and to approve and pay necessary company expenses pending the court's decision in the interpleader case.

x.     The Chicago district court separately conducted a hearing in connection with the parties' corporate control dispute.

6

## SCHWARTZ'S SCHEME TO TAKE OVER AND
## CONTROL THE COMPANIES BY FRAUD AND COERCION

2.      Beginning no later than in or about 2017, and continuing to the present,

at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MARK ALAN SCHWARTZ,

defendant herein, devised, intended to devise, and participated in a scheme to

defraud and to obtain money and property from:

> a.      Victim 1 and other company shareholders;
>
> b.      Company 1-PR and Company 2-PR (collectively, "the victim companies"); and
>
> c.      the university which owned the intellectual property rights to Victim 1's invention,

by means of materially false and fraudulent pretenses, representations, and

promises.

3.      As summarized below, SCHWARTZ waged a multi-year campaign to

take over the victim companies and their assets (including company bank accounts

and funds, real estate, intellectual property, and shareholder equity) through various

fraudulent methods and means, including, but not limited to:

> a.      **Misrepresentations to Banks:** SCHWARTZ opened company

bank accounts in the United States and Puerto Rico, and controlled the funds in those

bank accounts, based on the false pretense and misrepresentation that he was the

sole (100%) or majority (97%) owner in control of the companies.

b. **Identity Theft**: SCHWARTZ used Victim 1's personal identity information to open multiple company bank accounts in Puerto Rico, without Victim 1's knowledge and permission.

c. **Self-Appointment**: SCHWARTZ unilaterally named himself to all positions of company decision-making authority, including chairman of the board of directors, board representative of all company shareholders, treasurer, corporation counsel, and counsel before the U.S. Patent and Trademark Office. SCHWARTZ additionally retained his own law firm (and, more specifically, himself) to provide and bill legal services to the victim companies.

d. **Fabrication of Company Records**: SCHWARTZ fabricated company records—such as contracts, corporate resolutions, minutes of non-existent board meetings, and amended articles of incorporation and corporate bylaws—purporting to grant certain rights, benefits, corporate powers, and executive positions to himself and to members of his family after his termination by Victim 1.

e. **Stock Manipulation/Self-Dealing**: SCHWARTZ attempted to reward himself and his family, and to slant the existing ownership structure of the victim companies in his favor, through a series of opaque stock transactions, arbitrarily issuing valuable shares of company stock to himself, to members of his family, and to friends and non-employees, at the de minimis price of $10 per share, acting himself in the dual, conflicted capacities of issuer and purchaser of company stock.

8

f. **Misappropriation of Funds**: SCHWARTZ misappropriated company funds by:

      i. secretly transferring $324,000 from Company 2-PR's bank account to one of his own bank accounts;

      ii. draining the rest of the money from the company's bank account, in an amount totaling more than $3.9 million, by transferring the company's money to other bank accounts of his, in order to coerce Victim 1 to reinstate him as CEO and give him full control of the company;

      iii. continuing to charge the victim companies for purported business expenses and to make payments to his credit card accounts with company funds after he was fired by Victim 1; and

      iv. renting out the victim companies' headquarters to two local residents in Puerto Rico, and then using the rent proceeds to pay the supposed business expenses of himself and his wife, among other things, without the knowledge and consent of Victim 1 and other company shareholders.

g. **Abuse of the Legal System**: SCHWARTZ abused the legal system in multiple local and federal court jurisdictions, including by:

      i. filing a false corporate bankruptcy petition in the United States Bankruptcy Court for the District of Puerto Rico, attempting to force Company 2-PR into bankruptcy so that he could wrest control of the company's funds from the jurisdiction of the Colorado federal district court in the pending interpleader case;

        ii.     submitting a false invoice to the court-appointed receiver in Colorado, purportedly on behalf of Company 1-PR, seeking the payment of $325,750 to an account of his (SCHWARTZ's) choosing, threatening the receiver with legal liability if he failed to comply with SCHWARTZ's request;

        iii.    filing two false civil cases against Company 2-PR in a county court in Maryland, appearing on both sides of the cases (that is, in the dual, conflicted capacities of counsel for the plaintiffs and counsel for the defendant), in a fraudulent attempt to obtain judgments against the company and in his favor—again seeking to evade the authority and jurisdiction of the federal court presiding over the interpleader case in Colorado; and

        iv.    making false and misleading statements to a United States district judge while testifying in federal court in Chicago.

        h.    **Intimidation**: In connection with his ongoing efforts to take over the victim companies, SCHWARTZ also attempted to:

        i.     intimidate Victim 1 and his family through a series of belligerent and threatening confrontations (in-person and over the phone), text messages, and emails;

        ii.    fraudulently diminish Victim 1's corporate authority, stature, and relationship with fellow investors, colleagues, and peers in the business, medical and scientific communities, including Victim 1's university employer, by sending inflammatory emails in which he falsely and fraudulently attacked Victim 1's character, intentions, and abilities; and

iii.    intimidate attorneys retained by Victim 1 and Company 1-PR to handle the company's IP portfolio, by sending emails threatening them with civil, criminal, and malpractice claims.

### ACTS COMMITTED PRIOR TO SCHWARTZ'S TERMINATION
### (August 2017-August 2019)

**A.    *Setting Up and Controlling Company Bank Accounts***

4.    It was part of the scheme that SCHWARTZ set up two business accounts, one in the name of Company 1-PR and the other in the name of Company 2-PR, at a Wells Fargo branch in Edwards, Colorado. SCHWARTZ opened those bank accounts under the false pretense that he was the only owner of the companies, falsely representing to Wells Fargo that he had a 100% ownership interest in each company, when in fact, as SCHWARTZ knew, he never owned 100% of the victim companies.

5.    It was further part of the scheme that SCHWARTZ named himself as the sole signatory on both of those company bank accounts, and did not designate Victim 1 as a co-owner or a co-signatory, and thereby gave himself exclusive access to and control over any company funds later deposited into the accounts, and exclusive control over all account records.

6.    It was further part of the scheme that SCHWARTZ refused to share the bank account log-in and password information with Victim 1, members of Victim 1's family, or any representative of the company's shareholders. Nor did SCHWARTZ otherwise provide them with online access to the bank accounts.

7.    It was further part of the scheme that SCHWARTZ controlled all deposits to, and withdrawals from, those company bank accounts.

11

8.    It was further part of the scheme that SCHWARTZ provided no oversight or accounting of his banking activity to Victim 1 and other company shareholders.

**B.    *Self-Serving Employment Contract***

9.    It was further part of the scheme that SCHWARTZ created his own employment contract and attempted to remove the clause which authorized Victim 1 to terminate him.

10.    It was further part of the scheme that SCHWARTZ signed his employment contract in the dual capacities of employee and employer (that is, on behalf of himself and on behalf of Company 2-PR).

11.    It was further part of the scheme that SCHWARTZ represented in preamble to his employment contract that he "is hereby offered the position of **Chief Executive Officer** for the Company, reporting to the BOD Chairman of the Company," and then purported to name himself as Board Chairman in that same employment contract. SCHWARTZ did so by handwriting that title ("BOD CHMN.") below his signature, purportedly on behalf of the company, which, as SCHWARTZ then knew, was jointly owned by Victim 1 and numerous outside shareholders. SCHWARTZ thereby created the illusion that he was reporting to himself, in a fraudulent attempt to create a legal barrier to Victim 1's authority to terminate him in the future.

12. It was further part of the scheme that SCHWARTZ thereafter continued using the self-adopted title of Board Chairman in order to exercise undue influence and control over the victim companies, their operations, and assets.

## C. *Restricting Computer Access*

13. It was further part of the scheme that SCHWARTZ controlled access to company databases through his son, whom SCHWARTZ had hired to maintain and manage the companies' computer systems.

14. It was further part of the scheme that SCHWARTZ's son, acting at SCHWARTZ's direction, temporarily locked out Victim 1 and Victim 1's family from the companies' computer systems and databases. SCHWARTZ intentionally restricted the access of Victim 1, Victim 1's wife, and Victim 1's son to company email and other important electronic databases as part of an improper, fraudulent effort to diminish them, impair their abilities to do their jobs, and demonstrate his control over them.

## D. *Misappropriation of $324,000*

15. It was further part of the scheme that SCHWARTZ secretly transferred $324,000 from Company 2-PR's bank account at Wells Fargo to one of his checking accounts. SCHWARTZ transferred the company's money to his bank account, without the authorization of Victim 1 and other company shareholders, for personal reasons unrelated to the interests of the company, that is, for purposes of paying personal debts and expenses.

16. It was further part of the scheme that SCHWARTZ sent an email to Victim 1 in which he attempted to persuade Victim 1 to approve a personal loan to him—failing to disclose to Victim 1 that he had already taken the money from the company's bank account.

17. It was further part of the scheme that SCHWARTZ created, without Victim 1's knowledge, a false credit agreement between himself and the company, a so-called "Secured Revolving Line of Credit," in which he falsely characterized his unauthorized, undisclosed withdrawal of funds as a loan payable in five years with no interest, and which he unilaterally approved in the dual, conflicted capacities of "Borrower" (himself, as "Trustee" of a manufactured company trust) and "Lender" (by himself on behalf of the victim company).

18. It was further part of the scheme that SCHWARTZ, knowing that he was the only person who had access to the company's bank account and its records, intentionally failed to disclose to Victim 1 and other company shareholders that he had transferred $324,000 to his bank account and that he had mischaracterized—in the company's books and records—his misappropriation of funds as a company-approved, interest-free loan.

**E.    *Self-Appointment as Shareholder Board Representative***

19. It was further part of the scheme that SCHWARTZ unilaterally named himself as the board representative for all company shareholders, falsely depicting his self-appointment as an "emergency." In so doing, SCHWARTZ did not seek the

formal vote and approval of the shareholders or give them notice that he was appointing himself as their sole representative on the company's board of directors.

20.     It was further part of the scheme that SCHWARTZ fraudulently used his self-nomination and self-appointment as a means to exercise control over the board of directors (and its decision-making authority) under the false pretense that he was representing and speaking for all company shareholders.

### ACTS COMMITTED AFTER SCHWARTZ'S TERMINATION
### (September 2019-Present)

**A.**     *Retaliation Against Victim 1 and His Family*

#### Restricting Computer and Bank Access

21.     It was further part of the scheme that after Victim 1 fired SCHWARTZ, SCHWARTZ again took steps, through his son, to restrict the access of Victim 1 and Victim 1's family members to company databases—including email, science and regulatory files, and quality management systems—in order to assert and maintain his improper control over the victim companies.

22.     It was further part of the scheme that SCHWARTZ refused to surrender his control over company bank accounts, so that he could maintain his sole access to company funds, prevent Victim 1 from accessing company funds, and pressure Victim 1 to accede to his demands.

#### Emptying the Company's Main Bank Account

23.     It was further part of the scheme that SCHWARTZ accessed the company's main operating account at Wells Fargo online, and transferred out all of the company's money then on deposit, in an amount totaling more than $3.9 million.

At that moment, SCHWARTZ temporarily deprived the company of the working capital needed to continue operating the business. SCHWARTZ did so for the improper purpose of retaliating against Victim 1 for terminating him and to hold hostage the company's money as leverage against Victim 1—all without regard to the best interests of the company and its shareholders.

24. It was further part of the scheme that SCHWARTZ caused false notes to be entered into the records of Wells Fargo, misrepresenting that the purpose of his multi-million-dollar misappropriation of funds was to "safeguard funds," when in fact, as SCHWARTZ then knew, he was the only signatory on that company bank account and the only person with access to the funds in the account.

25. It was further part of the scheme that SCHWARTZ exercised sole control over the company's money by transferring it through separate accounts that he held under the names of his real estate businesses. SCHWARTZ temporarily held the company's money in his bank accounts in order to force Victim 1 to relinquish control of the company.

26. It was further part of the scheme that SCHWARTZ intentionally failed to disclose to Victim 1 and other company shareholders what he had done with the company's money, and instead concealed the location of the money by transferring it through his own bank accounts, to which Victim 1 and the other shareholders had no access.

## Inflammatory Email to All Company Stakeholders

27.    It was further part of the scheme that on or about the same day that
SCHWARTZ emptied the company's bank account, he sent an email to all the
company's "stakeholders," including all company shareholders, advisors, partners,
and others, in a fraudulent attempt to discredit Victim 1 and his family, to remove
them from any position of corporate authority and oversight, and to obtain, for
himself, control over the victim companies.

28.    It was further part of the scheme that SCHWARTZ made false,
fraudulent, and misleading claims about the qualifications of Victim 1 and his family,
their character, trustworthiness, and intentions.  For example, SCHWARTZ falsely
claimed that "[Victim 1 and his wife] have deliberately damaged this Company and
its Mission," when in reality, it was SCHWARTZ who had deliberately emptied the
company's bank account earlier that day, after having previously misappropriated
$324,000—neither of which were acts of "safeguarding" the company's "resources," as
SCHWARTZ falsely suggested he was doing in his email to all company stakeholders.

29.    It was further part of the scheme that SCHWARTZ falsely claimed that
the shareholders' investment funds were at risk because of the actions of Victim 1
and his family, while the shareholders' investment otherwise would be safe in his
(SCHWARTZ's) hands.  SCHWARTZ made such false, misleading claims knowing
that he had already transferred all shareholder funds from the company's bank
account to one of his own bank accounts, without any notice to and approval by Victim
1 and other company shareholders.

**Extorted Settlement and Release Agreement**

30.    It was further part of the scheme that SCHWARTZ used acts of intimidation and fraud—including (a) his misappropriation of all the money from the company's operating account; (b) his false, fraudulent, and misleading claims against Victim 1 and his family; and (c) false threats of seeking damages against Victim 1— to break down and pressure Victim 1 to reinstate him as CEO, to surrender control of the company to him, and to release him from any legal liability for his misappropriation and fraud.

31.    It was further part of the scheme that SCHWARTZ—having taken and held the company's working capital as hostage—drafted and emailed two false and fraudulent documents for Victim 1 and members of his family to sign, namely:

   a.    purported minutes of a "Special Emergency Meeting of Directors," falsely stating that a meeting of the company's board of directors had been conducted and that the board "resolved," among other things, to reduce the number of board seats from nine to five, and to give SCHWARTZ the power of appointment of a majority of the board seats; and

   b.    "Mutual Settlement and Release Agreement," purporting to settle the parties' dispute on certain terms that included the resignation of Victim 1's wife as acting CEO, and releasing SCHWARTZ, his family, and his companies from any debts and liabilities "arising from the beginning of time."

32.    It was further part of the scheme that SCHWARTZ continued to send emails to Victim 1 in which he continued to demand and pressure Victim 1 to sign

the settlement and release agreement, threatening legal damages and falsely claiming, among other things, that the settlement agreement "protected" Victim 1 and that "I really am trying to help you." As SCHWARTZ then knew, the settlement agreement did not protect Victim 1; SCHWARTZ was not "really trying" to help Victim 1; and SCHWARTZ instead was trying to gain control of the company, while releasing himself from all liability for his false and fraudulent actions.

33.     It was further part of the scheme that SCHWARTZ eventually broke down and coerced Victim 1 and his family members to sign the false and fraudulent documents drafted by him.

### B.     *Self-Appointment to Executive Positions*

34.     It was further part of the scheme that SCHWARTZ unilaterally named and retained himself to all positions of decision-making authority in the victim companies, claiming to wear multiple hats at once, including CEO, executive chairman of the board of directors, board member (of all other board seats), board secretary, treasurer, corporation counsel, and outside legal counsel.

35.     It was further part of the scheme that SCHWARTZ adopted and used multiple corporate titles at various times in various private communications and public filings.

36.     It was further part of the scheme that SCHWARTZ created and filed with the Government of Puerto Rico, Department of State, a series of false and fraudulent amended articles of incorporation, corporate bylaws, corporate resolutions, and minutes of board meetings in which he purported to act pursuant to

19

the various authorities granted to himself. SCHWARTZ created, filed, and signed corporate records and associated public filings in multiple, conflicted capacities, claiming to simultaneously hold all seats on the board of directors and all positions of senior executive decision-making authority within the victim companies.

37.     It was further part of the scheme that SCHWARTZ did not recognize any corporate authority or oversight by Victim 1 or any independent shareholder representative in his false and fraudulent corporate records, filings, communications, and activities.

## C.     *Unauthorized Website and Email Account*

38.     It was further part of the scheme that SCHWARTZ set up a website and email domain under the name of Company 2-PR, using the .net domain, competing with the company's existing .com domain, in another fraudulent attempt to exert his improper influence and control over the company.

39.     It was further part of the scheme that SCHWARTZ used the .net domain in his fraudulent and unauthorized emails, correspondence, and public filings, misleading others to believe that that was the company's official website and email domain, when in fact it was controlled by SCHWARTZ and had been set up by him without the knowledge and approval of Victim 1 and other company shareholders.

## D.     *Stock Manipulation and Self-Dealing*

### Company 1-PR's Stock

40.     It was further part of the scheme that SCHWARTZ created false and fraudulent corporate bylaws, entitled "Amended and Restated Bylaws of [Company

1-PR]," in which he essentially gave himself the exclusive power to control Company 1-PR. In those false and fraudulent amended bylaws, SCHWARTZ named himself to all positions of corporate authority, including chairman of the board of directors, CEO, secretary, and treasurer; he gave himself the de facto power to designate all members of the board of directors; and he gave himself the de facto power to, among other things, "enter into any contract or execute any instrument" on behalf of the company.

41.     It was further part of the scheme that SCHWARTZ unilaterally "ratified and approved" those false and fraudulent amended bylaws on behalf of the board of directors (signing his name four times, as if he alone occupied all seats on the board of directors) and on behalf of the company itself (signing his name an additional two times in the capacities of corporation counsel, board secretary, and treasurer). SCHWARTZ signed his name a total of six times underneath the false statement "the undersigned, being all of the Founding Shareholders and all of the Members of the Board of Directors of the Company," knowing that such statement was false because Victim 1 was the founding shareholder and a board member.

42.     It was further part of the scheme that SCHWARTZ created and signed those false and fraudulent amended bylaws without notice to and the approval of Victim 1—the original founder, chairman, and owner of the company.

43.     It was further part of the scheme that on the very same day that SCHWARTZ signed, adopted, and self-ratified the false and fraudulent amended bylaws, SCHWARTZ signed another false and fraudulent document that he had

drafted, entitled "Common Stock Subscription Agreement," pursuant to which he purported to issue two shares of common stock to his private trust, signing the Subscription Agreement in the dual, conflicted capacities as the buyer and seller of the stock. SCHWARTZ fraudulently issued two shares of company stock to himself without the knowledge and consent of Victim 1—who then held the only existing, legitimate share of common stock in Company 1-PR—in a fraudulent attempt to make himself the majority shareholder of the company.

44. It was further part of the scheme that SCHWARTZ fraudulently issued those two shares of common stock to himself at the arbitrary price of $10 per share, such stock price having no relationship to the actual value of the company at the time and its most valuable asset (its intellectual property).

45. It was further part of the scheme that SCHWARTZ thereafter continued fabricating and issuing shares of stock to himself, without Victim 1's knowledge and consent, including a fabricated stock certificate indicating that SCHWARTZ, through a private trust of his, was the registered holder of 48,000 shares of common stock of Company 1-PR.

46. It was further part of the scheme that SCHWARTZ created and signed a false and fraudulent corporate record, entitled "Minutes of Meeting of Directors," purporting to document that a meeting of the company's board of directors had been conducted in Puerto Rico—when in fact, no such board meeting had been conducted—during which the board "resolved," among other things, to approve the issuance of 48,000 shares of common stock to SCHWARTZ, "giving him equity ownership and

voting control of just over 97% of the Company." Participating in that so-called meeting of the board of directors, according to SCHWARTZ's false board minutes, was SCHWARTZ and no one else ("[p]articipating in person were the undersigned [SCHWARTZ], previously installed Board Members [sic]"). SCHWARTZ, having designated himself to all seats on the board of directors, signed the false board minutes five times in five different capacities—that is, in the capacities of all five purported board members ("by the undersigned, being all of the Directors of the Company [sic]")—and an additional two times purportedly approving the minutes on behalf of the corporation itself (signing in his previously self-adopted capacities of corporation counsel, board secretary, and treasurer).

47.     It was further part of the scheme that SCHWARTZ attached a number of documents to support those false board minutes, including a fraudulent document entitled "Stockholder Action by Written Consent Without a Meeting," in which he falsely claimed that "the undersigned stockholders of the Corporation" (meaning himself only, not including Victim 1) had voted to "affirm and approve" certain transactions that he had manufactured himself, including the purchase of 48,000 shares of company stock "by payment and tender of $9,600 to the Company."

48.     It was further part of the scheme that SCHWARTZ did not "pay" and "tender" $9,600 "to the Company"—contrary to that misleading claim which he made in his fraudulent "Stockholder Action by Written Consent Without a Meeting." Rather, SCHWARTZ basically paid himself, writing a personal check in the amount of $9,600 (representing a stock price of 20 cents per share), which he made payable

to the company and then deposited into a bank account over which he had sole access and control—an account that he had opened in the company's name at a bank in Puerto Rico (namely, First Bank Puerto Rico), and to which he had fraudulently submitted Victim 1's personal identity information (namely, copies of Victim 1's passport and social security information), without Victim 1's knowledge and consent, and thereby misled the bank and defrauded Victim 1.

49.    It was further part of the scheme that SCHWARTZ knowingly and intentionally failed to give notice to Victim 1 before he fraudulently issued new shares of common stock to himself.

### Company 2-PR's Stock

50.    It was further part of the scheme that SCHWARTZ issued shares of stock in Company 2-PR to himself and to members of his family in a fraudulent attempt to make himself and his family the largest shareholders of the company.

51.    It was further part of the scheme that SCHWARTZ issued such stock at a price of $10 per share—far below the tens of thousands of dollars per share paid by the Series A investors in prior stock offerings—thereby diluting the ownership interests of Victim 1 and other shareholders, while personally benefitting himself and his family.  SCHWARTZ did so without the knowledge of, or notice to, Victim 1 and other Series A shareholders.

52.    It was further part of the scheme that SCHWARTZ and his family paid for those shares of stock with personal checks issued by SCHWARTZ's wife, which checks were then deposited into a bank account controlled by SCHWARTZ at another

24

bank in Puerto Rico (Banesco)—an account to which Victim 1 and the other shareholders had no access—so that he (SCHWARTZ) could hide from Victim 1 and other shareholders the details of those stock transactions.

53. It was further part of the scheme that SCHWARTZ fraudulently issued additional shares of common stock to an attorney whom he retained to represent him in the federal civil case pending against him in Chicago, and to other non-employees of the company, at the same diluted price of $10 per share—again without the knowledge, consent, and participation of Victim 1 and other shareholders.

54. It was further part of the scheme that SCHWARTZ fraudulently issued shares of company stock without honoring Victim 1's contractual rights as a founding investor in the company and, in particular, Victim 1's right of first refusal to participate and purchase a pro rata share of any new securities of the company, and without notice, or offering any right of participation, to other Series A shareholders.

### Termination of Victim 1's Family Stock Options

55. It was further part of the scheme that SCHWARTZ sought to cement his control over the company by cancelling the employee stock options of Victim 1, Victim 1's wife, and Victim 1's son. SCHWARTZ cancelled their stock options in a fraudulent attempt to ensure that he maintained control of Company 2-PR and in retaliation for Victim 1's filing of civil lawsuits against him and refusing to surrender to his demands.

56. It was further part of the scheme that SCHWARTZ created false and fraudulent corporate records to memorialize the termination of Victim 1's and his

family's stock options—each such record entitled "Notice of Option Termination"—without giving actual notice to Victim 1 and his family. SCHWARTZ signed the false and fraudulent Notices of Option Termination as the company's "CEO, Board Chairman, CEO [sic]," despite having been previously terminated by Victim 1.

## Fake Wyoming Corporation

57.     It was further part of the scheme that SCHWARTZ incorporated a false corporate subsidiary or affiliate of Company 2-PR in the State of Wyoming, in connection with his plan to control the future direction, location, and assets of the company.

58.     It was further part of the scheme that SCHWARTZ's fraudulent Articles of Incorporation falsely represented that his Colorado residence was the company's principal office address, when in fact it was not, and that he was authorized to file the Articles of Incorporation on behalf of Company 2-PR, when in fact, he did so without the authorization and knowledge of Victim 1 and other company shareholders.

59.     It was further part of the scheme that SCHWARTZ manufactured a false "Stock Purchase Agreement" between himself and Company 2-PR, pursuant to which he purported to purchase, on behalf of Company 2-PR, 1,000 shares of common stock of the new Company 2-Wyoming for a total of $200.

60.     It was further part of the scheme that SCHWARTZ memorialized that false and fraudulent stock transaction by creating a fake "Stock Certificate" which he

signed on both sides of the transaction—that is, between himself as buyer and seller of the stock.

### E.    *Abuse of the Legal System*

#### False Bankruptcy Case (Puerto Rico)

61.    It was further part of the scheme that SCHWARTZ removed Victim 1's wife as a signatory on a company bank account at Banesco in Puerto Rico.

62.    It was further part of the scheme that SCHWARTZ subsequently sent an email to Victim 1, Victim 1's wife, and Victim 1's son, demanding, among other things, that they cease acting as officers of the company and that they instruct Wells Fargo to transfer the company's money from its main operating account at Wells Fargo—an account which was then under the jurisdiction of a federal court in Colorado—to the company's bank account at Banesco, an account to which SCHWARTZ then had sole access and control. SCHWARTZ made that fraudulent demand knowing that he already had been terminated by Victim 1 and that he was speaking for himself, not for the company and its stakeholders and creditors, as he falsely claimed.

63.    It was further part of the scheme that because Victim 1 and his family did not consent to SCHWARTZ's demands, SCHWARTZ filed a false and fraudulent corporate bankruptcy case in Puerto Rico. SCHWARTZ did so in a fraudulent attempt to:

         i.    misuse the federal bankruptcy process to create the legal fiction of a corporate bankruptcy estate;

   ii. force Wells Fargo to release the millions of dollars then on deposit in the company's account at Wells Fargo; and

   iii. cause those company funds to be transferred to a debtor-in-possession bank account that he opened in Puerto Rico, purportedly on behalf of the company, at which point he would have control over the company's funds and seek to pay himself and his family members and to exercise sole control over the future direction of the company.

  64. It was further part of the scheme that SCHWARTZ filed, and caused to be filed, a Chapter 11 bankruptcy petition, purportedly on behalf of Company 2-PR, in the United States Bankruptcy Court for the District of Puerto Rico. SCHWARTZ caused that bankruptcy petition to be filed by a bankruptcy attorney in Puerto Rico whom he retained without the formal authority and approval of Victim 1 and other company shareholders, and despite the fact that there was no legitimate bankruptcy purpose for filing bankruptcy on behalf of Company 2-PR, as the company was not actually bankrupt, insolvent, or unable to pay its creditors.

  65. It was further part of the scheme that SCHWARTZ created, in support of his fraudulent Chapter 11 bankruptcy petition, a false "Corporate Resolution," signed by him in his purported capacity as Company 2-PR's Secretary, on Company 2-PR's letterhead, in which he falsely represented that:

   a. Company 2-PR's board of directors had conducted a meeting in which the board "agreed" to file a bankruptcy petition;

b. Company 2-PR's shareholders had conducted a meeting "celebrated on the same date," in which the shareholders "unanimously approved" the bankruptcy filing;

c. "it was also agreed that Mr. Mark A. Schwartz will be the person authorized to sign the [Bankruptcy] Petition, Schedules and Statement of Financial Affairs and any other matter and/or documents related to the bankruptcy proceedings"; and

d. "it was also agreed that Mr. Mark A. Schwartz procure the services of [a certain bankruptcy attorney] and that she be retained for such purposes," when in fact, as SCHWARTZ then knew, there were no such meetings of the company's board of directors and shareholders; the company's directors and shareholders had not approved, let alone "unanimously" approved, the filing of a bankruptcy petition on behalf of the company; and the company's directors and shareholders had not agreed that he would sign a bankruptcy petition and related documents and retain a bankruptcy attorney on behalf of the company.

66. It was further part of the scheme that the fraudulent bankruptcy petition filed and caused to be filed by SCHWARTZ fraudulently listed himself, his wife, and his children, among others, as creditors with secured claims against the funds in the company's bank account at Wells Fargo—such claims totaling more than $500,000—while the bankruptcy petition listed Victim 1, Victim 1's wife, and Victim 1's son among the list of non-priority creditors, with unsecured claims in "unknown" amounts. SCHWARTZ thereby sought to abuse the bankruptcy process and

fraudulently obtain court approval to prioritize payments to himself and his family from the working capital of Company 2-PR.

67.     It was further part of the scheme that the bankruptcy petition filed and caused to be filed by SCHWARTZ falsely represented that Victim 1 had ceased serving as an officer of Company 2-PR as of August 31, 2019, when in fact that was the date that Victim 1 had terminated SCHWARTZ's employment.

68.     It was further part of the scheme that SCHWARTZ, directly and indirectly (through his bankruptcy counsel), falsely held himself out to the U.S. Bankruptcy Court and to the U.S. Bankruptcy Trustee as Company 2-PR's Chief Executive Officer, with the appropriate corporate authority to file and pursue the bankruptcy case, when in fact SCHWARTZ previously had been terminated and he had no legitimate authority to file a bankruptcy case on behalf of the company.

69.     It was further part of the scheme that in connection with SCHWARTZ's false and fraudulent attempt to force Company 2-PR into bankruptcy and to take control of the money in its bank account at Wells Fargo, SCHWARTZ set up a debtor-in-possession account at a bank in Puerto Rico, purportedly on behalf of Company 2-PR.  SCHWARTZ did so in an effort to force Wells Fargo to transfer all of Company 2-PR's funds to the bank account that he set up in Puerto Rico, an account to which Victim 1 and other shareholders had no access, and over which SCHWARTZ provided no signatory authority to anyone other than himself.

70.     It was further part of the scheme that SCHWARTZ misled the Puerto Rican bank by tendering a copy of Victim 1's passport and Victim 1's social security

information, falsely leading the bank to believe that Victim 1 knew about and had approved the opening of a new bank account in Company 2-PR's name, when in fact Victim 1 had no knowledge that SCHWARTZ was setting up a new bank account and using his (Victim 1's) personal identity information to fraudulently induce the bank to open a company account.

71.     It was further part of the scheme that SCHWARTZ knowingly and intentionally caused his bankruptcy attorney to send a letter to counsel for Wells Fargo, advising that her law firm represented Company 2-PR; that Company 2-PR had filed for relief pursuant to the provisions of Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Puerto Rico; and that upon the filing of the bankruptcy petition, "all proceedings" against the company were stayed and a bankruptcy estate was created.  In that letter, SCHWARTZ's bankruptcy attorney requested that the company's funds then on deposit in the company's Wells Fargo bank account be transferred immediately to a "DIP" (debtor-in-possession) account at another bank in Puerto Rico.    SCHWARTZ's bankruptcy attorney—acting in SCHWARTZ's personal self-interest and not that of the company and its outside shareholders—threatened to seek sanctions from the bankruptcy court if Wells Fargo refused to immediately transfer the funds to the DIP bank account.

72.     It was further part of the scheme that SCHWARTZ sent an email to the company's shareholders and others, in which he announced the filing of the corporate bankruptcy case and falsely stated, among other things, that such action was taken "in order to safeguard the assets of the Corporation under the current liquidity crisis

31

and to be able to continue operations, in the best interest of creditors, investors, and also considering the investors themselves," when in fact, as SCHWARTZ then knew, the company had more than $3 million with which to pay creditors and to continue operations; those funds were safeguarded in a Wells Fargo bank account under the jurisdiction of a federal district court; and he filed the bankruptcy case so that he could obtain exclusive control over the funds, not because bankruptcy was in the best interest of the company's creditors and investors.

73.    It was further part of the scheme that before SCHWARTZ took the above actions, he did not—directly or indirectly through his bankruptcy attorney—fully and truthfully inform Wells Fargo, Victim 1, other company shareholders, and the federal courts presiding over the pending cases in Colorado and Chicago that he was solely behind the filing of the bankruptcy case; that he had opened the DIP bank account in Puerto Rico; and that he had misled or was intending to mislead the Puerto Rican bank into believing that Victim 1 knew about and had consented to the opening of a debtor-in-possession bank account and the filing of a bankruptcy case on behalf of the company.

### False Statements to the Court-Appointed Receiver (Colorado)

74.    It was further part of the scheme that SCHWARTZ drafted and tendered a false and fraudulent invoice to the court-appointed receiver overseeing the Wells Fargo bank account in Colorado, along with a cover memo entitled "Notice of Intent to Terminate," in which SCHWARTZ requested the payment of $325,750, based on the false pretense that such funds were needed to maintain the victim companies'

32

intellectual property licenses and rights, that the current situation was "**urgent and untenable**," and that the companies were in "**imminent danger** of losing their respective rights" (emphases in original).

75.     It was further part of the scheme that SCHWARTZ portrayed his false and fraudulent invoice as an authentic invoice of Company 1-PR, with a listed address in care of him ("C/o Mark A. Schwartz") at his residence in Dorado, Puerto Rico, when in fact, as SCHWARTZ then knew, Victim 1 (the company's founding shareholder and board chairman) had not authorized the submission of that false invoice on behalf of the company.

76.     It was further of the scheme that SCHWARTZ, in his false invoice and cover memo, requested the receiver to wire-transfer $325,750 to a bank account of SCHWARTZ's choosing.

77.     It was further part of the scheme that SCHWARTZ made a thinly veiled threat of legal action against the receiver for failing to comply with his request.

**False Corporate Debt-Collection Cases (Maryland)**

78.     It was further part of the scheme that after SCHWARTZ failed to gain access to victim-company funds through the above fraudulent methods and means, he attempted to manipulate and misuse the Maryland court system as another means of compelling payments to him with company funds.  SCHWARTZ filed two false complaints for "Confession of Judgment by Consent" (emphasis in original) in the Circuit Court of Montgomery County, Maryland, seeking to confess judgment on behalf of Company 2-PR for over $1.67 million in supposed legal fees owed to him (in

33

one case) and \$534,500 in supposed IP licensing fees owed to Company 1-PR (in the other case).

79.     It was further part of the scheme that SCHWARTZ filed those cases in the dual, conflicted capacities as the attorney for the plaintiffs and attorney for the defendant (Company 2-PR), with the purported authority to consent to the entry of a judgment against Company 2-PR in each case.

80.     It was further part of the scheme that SCHWARTZ attached false and fraudulent affidavits to his civil complaints, in which he falsely represented, among other things, that he filed the cases in Maryland because Company 2-PR had assets and other collateral "which may be attached and levied upon in Maryland," when in fact, as SCHWARTZ well knew, the company had no assets and collateral in Maryland.

81.     It was further part of the scheme that SCHWARTZ attached additional false and fraudulent documents allegedly supporting his complaint for unpaid legal fees, including:

        a.     "Legal Services Agreement," purportedly between his private law firm ("MS Law Group, LLC") and Company 2-PR, which he signed in the dual, conflicted capacities as attorney and client, obligating the company to pay legal fees to his firm at certain hourly rates of his choosing;

        b.     multiple, so-called "Statements for Legal Fees and Costs," signed by him on behalf of his law firm, directed to the attention of the "A/P Department" of the victim companies, to which he attached statements of "legal services rendered

34

during the Billing Period," pursuant to which he requested a total of $1,671,020.55 in legal fees supposedly owed to him; and

c.      "Secured Demand Note for Unpaid Legal Services" and "Security Agreement for Unpaid Legal Services," signed by him on behalf of the "Borrower" (Company 2-PR) and initialed by his wife as a witness.

82.      It was further part of the scheme that SCHWARTZ attached additional false and fraudulent documents allegedly supporting his complaint for alleged unpaid IP license fees, including:

a.      "Secured Demand Note for Unpaid License Fees" and "Security Agreement for Unpaid License Fees," signed by him on behalf of the "Borrower" (Company 2-PR) and by his wife as a witness; and

b.      "Invoice" purportedly from Company 1-PR, in care of ("C/o") SCHWARTZ at his Puerto Rican residence, claiming a total of $534,500 from Company 2-PR.

83.      It was further part of the scheme that SCHWARTZ filed those false and fraudulent cases in Maryland without the knowledge and consent of Victim 1 and other company shareholders, and without notice to the federal court presiding over the pending interpleader case in Colorado and the federal court presiding over the pending corporate control case in Chicago.

**False and Misleading Testimony (Chicago)**

84.      It was further part of the scheme that SCHWARTZ gave false and misleading testimony during an evidentiary hearing conducted by a United States

district judge presiding over the civil case filed by Victim 1 and his family in Chicago. During a hearing on the plaintiffs' motion for a preliminary injunction, SCHWARTZ made the following false and misleading statements, among others, while testifying:

      a.     that SCHWARTZ took a $324,000 personal loan from Company 2-PR with Victim 1's knowledge and approval ("I told [Victim 1]...I'm going to have to take some of this money back in the form of a loan. He was fine with that" (Tr. 296:6-8); "this was not something at the time that he even objected to" (Tr. 303:18-19); "it was promised to me back as a loan by my partner [Victim 1]" (Tr. 305:2-3); "We were always on the same page with the loan" (Tr. 345:17-18)), when in fact, as SCHWARTZ then knew, Victim 1 did not know about and approve of SCHWARTZ's withdrawal of $324,000 from the company's bank account;

      b.     that Victim 1 did not have the authority to terminate SCHWARTZ ("I'm still the CEO. You can't do that [terminate SCHWARTZ] without board approval" (Tr. 310:19-24); "only a board can hire and fire the CEO and officers" (Tr. 314:17-18); "you can't fire an equal partner. It just makes sense" (Tr. 315:2)), when in fact, as SCHWARTZ then knew, Victim 1 had the authority to terminate him since the time of the company's founding and that was a negotiated, material term of his employment;

      c.     that SCHWARTZ was the only current member of the company's board of directors ("right now, it's me" (Tr. 389:19); "No one wants to step in at this point" (Tr. 389:23); "right now the directors are just—are myself [sic]" (Tr. 389:24); (Tr. 497:7-14)), when in fact, as SCHWARTZ then knew, the current board of

directors included Victim 1 and an elected representative of the Series A shareholders; and

       d.    that SCHWARTZ issued shares of company stock or stock options to his defense attorney (a non-employee of the company) for purposes of representing Company 2-PR ("he is working for [Company 2-PR] defending it" (Tr. 396:5-6); "I says,…we want—I want you to represent me in this case…and it wasn't really me. I want you to defend [Company 2-PR]" (Tr. 396:20-22)); when in fact, as SCHWARTZ then knew, his attorney was representing him and serving his interests, and neither the board of directors nor the shareholders of the company had voted to retain his attorney to represent the company and to issue company stock or stock options to him.

## F.    *Control of Company Assets and Records*

### Bank Accounts, Books and Records

85.    It was further part of the scheme that SCHWARTZ gave himself the authority to control company bank accounts that he opened prior to his termination and to open new company bank accounts after his termination.

86.    It was further part of the scheme that SCHWARTZ kept custody and control over the companies' books and records, including financial, accounting, and bank records, without providing access to Victim 1 and other shareholders.

### Intellectual Property

87.    It was further part of the scheme that SCHWARTZ attempted to exercise control over the patent and trademark portfolio of Company 1-PR by:

a.      creating a new "Exclusive License Agreement" between Company 1-PR and Company 2-PR, in which he unilaterally altered the amount of the royalties to be paid between the companies, signing this new Exclusive License Agreement on behalf of the "Licensor" (Company 1-PR) in place of Victim 1, without Victim 1's knowledge and consent, and also on behalf of the "Licensee" (Company 2-PR), after he had been terminated by Victim 1;

b.      filing a change-of-address form with the U.S. Patent and Trademark Office, revoking the existing counsel of record for Company 1-PR and removing Victim 1's email address as the point of contact for the company, and replacing them with himself, listing his own email address in place of Victim 1's email address, and listing his own personal law office ("Law Office of Mark A. Schwartz, Esq") as the company's new legal representative before the U.S. Patent and Trademark Office, thereby assuming for himself the important role of representing and protecting the company's intellectual property rights;

c.      communicating with Company 1-PR's intellectual property partners and agents—falsely holding himself out as the CEO and board chairman of both of the victim companies—and directing them not to communicate with and respond to the attorneys retained by Victim 1 and Company 1-PR to handle its intellectual property portfolio; and

d.      making false threats of civil and criminal liability to the attorneys at that intellectual property law firm, in order to coerce the firm into resigning as the

company's IP counsel and to dissuade them from contacting the company's IP agents and partners.

88.     It was further part of the scheme that SCHWARTZ sent a false and fraudulent "Notice to Immediately Cease and Desist" to an attorney at the IP firm retained by Victim 1 and Company 1-PR, in which SCHWARTZ falsely represented that he was the CEO and chairman of the victim companies; that Victim 1 was not a director, officer, or director of the companies and did not have the authority to retain the firm to represent the companies; and that the firm's legal bills would not be paid by the court-appointed receiver in Colorado—claims that SCHWARTZ had no basis for making.

89.     It was further part of the scheme that in the above cease-and-desist notice, SCHWARTZ made false threats of civil, criminal, and malpractice liability against the victim companies' IP counsel in order to intimidate and discourage them from effectively representing their clients.

90.     It was further part of the scheme SCHWARTZ subsequently sent emails to attorneys of the firm, reiterating his false and fraudulent threats of legal action.

91.     It was further part of the scheme that SCHWARTZ falsely held himself out to Victim 1's university employer—the owner and original licensor of the intellectual property rights to Victim 1's invention—as the CEO and board chairman of both of the victim companies (Company 1-PR and Company 2-PR), falsely denigrating Victim 1 and Victim 1's family, while promoting himself.

### Real Estate and Equipment

92.     It was further part of the scheme that SCHWARTZ exercised sole custody and control over the victim companies' property, office equipment, and supplies in Puerto Rico, not permitting access to Victim 1 or any representative of the other shareholders.

93.     It was further part of the scheme that SCHWARTZ sent an email to one of Victim 1's attorneys, copied to Victim 1, in which SCHWARTZ threatened to have Victim 1 and his family arrested if they attempted to access the company's property.

94.     It was further part of the scheme that SCHWARTZ additionally used the above email and threat to renew his fraudulent demand that Victim 1 agree to transfer all company funds from the company bank account at Wells Fargo to the bank account that SCHWARTZ had fraudulently opened in Puerto Rico with Victim 1's misappropriated identity information.

95.     It was further part of the scheme that after SCHWARTZ failed in his attempts to gain access to company money by making threats and demands of Victim 1, and by filing false and fraudulent cases against the company, SCHWARTZ sought to drain liquidity from the company by secretly leasing out its multi-million-dollar headquarters in Puerto Rico to two local residents—persons who had no connection to the victim companies, the companies' business operations, or any incentive to improve, enhance, or preserve the property for the use and benefit of the victim companies and shareholders.

96.     It was further part of the scheme that SCHWARTZ leased the company's property without notice to, or the approval of, Victim 1 and other company shareholders, falsely holding himself out to the lessees and the realtor as the corporate official with the proper authority to lease and encumber the property with a one-year lease. SCHWARTZ unilaterally encumbered the property with this lease, knowing that the control of the company and its assets was then the subject of a federal case pending in the Northern District of Illinois.

97.     It was further part of the scheme that SCHWARTZ required the lessees to pay one full year of rent up-front, at the beginning of the lease. SCHWARTZ fraudulently and intentionally structured the lease in that way so that he could obtain immediate possession of a lump sum payment exceeding $300,000 and misappropriate the funds before any victim or any court could prevent it.

98.     It was further part of the scheme that SCHWARTZ caused and directed the deposit of the lessees' lump-sum rental payment into a Puerto Rican bank account that he had previously set up in part by using Victim 1's misappropriated identity information.

99.     It was further part of the scheme that SCHWARTZ misappropriated the rental proceeds to make payments to himself and his wife, to pay their credit card bills, and to pay the Puerto Rican bankruptcy attorney whom he previously had retained to file the false bankruptcy case described above. SCHWARTZ did so without notice to Victim 1, other company shareholders, or the Chicago district judge presiding over the case pending against him.

41

100.   It was further part of the scheme that SCHWARTZ caused the realtor to send an email to the lessees, introducing them to SCHWARTZ and his wife as "the owners of the building" and providing their contact information for answering any questions about the building.

101.   It was further part of the scheme that SCHWARTZ created a false and fraudulent record of a non-existent company board meeting in an attempt, after the fact, to give himself the corporate authority to lease the property.  In that false and fraudulent record, entitled "Minutes of Meeting of Directors," SCHWARTZ claimed that "[a] special meeting of the Board of Directors" was held in Dorado, Puerto Rico, and that "[p]articipating in person were the undersigned [SCHWARTZ], as Board Members [sic], its CEO, its Chairman of the Board, its Secretary, its Treasurer, and its largest Shareholder, Mark A. Schwartz, MD JD, who as of this date remains and constitutes the legitimate Board of Directors [sic]."

102.   It was further part of the scheme that in such false and fraudulent "Minutes of Meeting of Directors," SCHWARTZ claimed that the board of directors (consisting solely of himself) had "resolved" to, among other things, approve the lease of the company's building and the disbursement of the rental proceeds pursuant to a certain payment and reimbursement schedule, falsely authorizing the disbursement of the rental proceeds to himself, his wife, and his bankruptcy counsel.

103.   It was further part of the scheme that SCHWARTZ obtained and disposed of those funds without prior notice to Victim 1, other company shareholders,

or the court presiding over the corporate control dispute pending in the Northern District of Illinois.

104. It was further part of the scheme that SCHWARTZ misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence of the scheme, the purposes of the scheme, and the acts committed in furtherance of the scheme.

## EXECUTION OF THE SCHEME

105. On or about September 2, 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MARK ALAN SCHWARTZ,

defendant herein, for the purpose of executing the scheme described above, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email to all company stakeholders, including shareholders residing in the Northern District of Illinois, entitled:

> "Notice to all [Company 2-PR] Stakeholders of the illegal retaliatory discharge of its CEO, attempted extortion, and armed hostile takeover of [Company 2-PR] and its headquarters in Puerto Rico by [Victim 1] and his wife [ ],"

in which SCHWARTZ made false and misleading claims about the qualifications, trustworthiness, and intentions of Victim 1 and his wife, with the fraudulent intent of having them removed from any position of corporate authority and so that he could take over the company;

In violation of Title 18, United States Code, Section 1343.

43

## COUNT TWO
## (Wire Fraud)

The SPECIAL JULY 2021 GRAND JURY further charges:

1.      Paragraphs 1 through 104 of Count One are incorporated here.

2.      On or about September 8, 2019, in the Northern District of Illinois,
Eastern Division, and elsewhere,

### MARK ALAN SCHWARTZ,

defendant herein, for the purpose of executing the scheme described above, knowingly
transmitted and caused to be transmitted by means of wire communication in
interstate commerce, certain writings, signs, and signals, namely, a response to an
email from Victim 1 entitled "agreement"—in which SCHWARTZ falsely claimed that
the settlement agreement he drafted was "necessary to protect" Victim 1—in order to
fraudulently induce and coerce Victim 1 to sign the agreement on terms dictated by
SCHWARTZ;

In violation of Title 18, United States Code, Section 1343.

44

### COUNT THREE
### (Wire Fraud)

The SPECIAL JULY 2021 GRAND JURY further charges:

1.      Paragraphs 1 through 104 of Count One are incorporated here.

2.      On or about January 2, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MARK ALAN SCHWARTZ,

defendant herein, for the purpose of executing the scheme described above, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email to Victim 1, Victim 1's wife, and Victim 1's son, entitled "Urgent Demand By [Company 2-PR] to Cease and Desist Immediately," in which SCHWARTZ made threatening statements in connection with his fraudulent efforts to coerce and intimidate them and to obtain control over company funds then on deposit at Wells Fargo;.

In violation of Title 18, United States Code, Section 1343.

45

## COUNT FOUR
### (Wire Fraud)

The SPECIAL JULY 2021 GRAND JURY further charges:

1.      Paragraphs 1 through 104 of Count One are incorporated here.

2.      On or about January 10, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

MARK ALAN SCHWARTZ,

defendant herein, for the purpose of executing the scheme described above, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email to Company 2-PR's shareholders, including residents of the Northern District of Illinois, entitled "Notice of [Company 2-PR] Bankruptcy…," in which SCHWARTZ made false, fraudulent, and misleading statements concerning the filing of the corporate bankruptcy case in the United States Bankruptcy Court for the District of Puerto Rico;

In violation of Title 18, United States Code, Section 1343.

## COUNT FIVE
### (Wire Fraud)

The SPECIAL JULY 2021 GRAND JURY further charges:

1.      Paragraphs 1 through 104 of Count One are incorporated here.

2.      On or about January 14, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MARK ALAN SCHWARTZ,

defendant herein, for the purpose of executing the scheme described above, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email to Victim 1 and the board representative of Company 2-PR's shareholders, entitled "Notiice [sic] of Bankruptcy Filing and Automatic Stay," in which SCHWARTZ provided them with notice of the filing of his false and fraudulent corporate bankruptcy case;

In violation of Title 18, United States Code, Section 1343.

## COUNT SIX
### (Wire Fraud)

The SPECIAL JULY 2021 GRAND JURY further charges:

1.      Paragraphs 1 through 104 of Count One are incorporated here.

2.      On or about March 14, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

### MARK ALAN SCHWARTZ,

defendant herein, for the purpose of executing the scheme described above, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an email to the victim university's Associate General Counsel, in which SCHWARTZ made false, fraudulent, and misleading allegations against Victim 1 and his family;

In violation of Title 18, United States Code, Section 1343.

## COUNT SEVEN
### (Aggravated Identity Theft)

The SPECIAL JULY 2021 GRAND JURY further charges:

1.     Paragraphs 1 through 104 of Count One are incorporated here.

2.     On or about January 8, 2020, in the District of Puerto Rico and the Northern District of Illinois, Eastern Division,

### MARK ALAN SCHWARTZ,

defendant herein, knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person, specifically, the name, social security number, date of birth, and U.S. passport number of Victim 1, during and in relation to a felony violation, specifically, the wire fraud offense alleged in Count One, by transferring Victim 1's identity information to a bank, Santander Puerto Rico, for purposes of opening a company bank account without Victim 1's knowledge and consent;

In violation of Title 18, United States Code, Section 1028A(a)(1).

49

## COUNT EIGHT
### (Aggravated Identity Theft)

The SPECIAL JULY 2021 GRAND JURY further charges:

1.      Paragraphs 1 through 104 of Count One are incorporated here.

2.      On or about January 16, 2020, in the District of Puerto Rico and the Northern District of Illinois, Eastern Division,

### MARK ALAN SCHWARTZ,

defendant herein, knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person, specifically, the name, social security number, date of birth, and U.S. passport number of Victim 1, during and in relation to a felony violation, specifically, the wire fraud offense alleged in Count One, by transferring Victim 1's identity information to a bank, First Bank Puerto Rico, for purposes of opening a company bank account without Victim 1's knowledge and consent;

In violation of Title 18, United States Code, Section 1028A(a)(1).

A TRUE BILL:

_____
FOREPERSON

_____
Signed by Jason Yonan on behalf of
the UNITED STATES ATTORNEY

50